UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
ALLIANCE FOR DEMOCRACY, et al.,     )    Civ. No. 04-CV-00127 (RBW)
                                    )
            Plaintiffs,             )
                                    )
      v.                            )
                                    )
FEDERAL ELECTION COMMISSION,        )
                                    )
            Defendant.              )
_____)

**MEMORANDUM OPINION**

     This is an action that has been brought pursuant to the Federal Election Campaigns Act ("FECA"), 2 U.S.C. § 431 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201. The plaintiffs seek redress for the Federal Election Commission's ("FEC") dismissal of the central allegations of their administrative complaint claiming that the dismissal was arbitrary and capricious, contrary to law, and a clear abuse of the agency's discretion. Plaintiffs' Complaint (Compl.) ¶ 2. Currently before the Court is Defendant Federal Election Commission's Motion to Dismiss, or in the Alternative, for Summary Judgment ("Def.'s Mot.") [D.E. # 13], the plaintiffs' opposition thereto and the defendants reply. For the reasons discussed below, this Court will grant the defendant's motion.[1]

**I.    Background**

     On the day of John Ashcroft's Senate confirmation hearing for the position of Attorney General, the Washington Post reported that during his 2000 Missouri Senate

---

[1] The Court acknowledges receipt of the supplemental authority filed by both parties and will consider these submissions in its analysis.

campaign, Spirit of America PAC (hereafter "SOA")[2] gave a fundraising list of 100,000 donors to Ashcroft 2000, and that neither Ashcroft's campaign nor his political action committee ("PAC") reported the contribution to the Federal Election Commission ("FEC"). Plaintiffs Alliance For Democracy, Hedy Epstein, and Ben Kjelshus' Opposition to Defendant's Motion to Dismiss, or in the Alternative, For Summary Judgment ("Pl.'s Opp'n") at 2 & Exhibit ("Ex.") D (Walter Pincus, "Possible Ashcroft Campaign Violation," Washington Post, February 1, 2001) at A4. The article did not report the market value of the list or any quote from the Ashcroft campaign or his PAC regarding the value of the list. Id. About one month later, on March 8, 2001, the plaintiffs filed an administrative complaint with the FEC against Ashcroft 2000 and SOA. Compl. ¶ 9. The administrative complaint, designated MUR 5181, alleged that SOA "contributed a fund-raising list of approximately 100,000 donors to Ashcroft 2000 and that, in turn, Ashcroft 2000 made a significant amount of money by renting the list to other entities." Id. ¶ 10.[3] The administrative complaint further alleged that "the donation of the fund-raising list by SOA to Ashcroft 2000 constituted a 'contribution' as defined by federal law," and that the contribution was illegal because it exceeded the applicable limit on PAC contributions to candidate committees. Id. ¶ 11 (citing 2 U.S. C.

---

[2]SOA was a political committee that had been founded and chaired by John Ashcroft. Defendant Federal Election Commission's Memorandum of Points and Authorities in Support of its Motion to Dismiss, or in the Alternative, for Summary Judgment ("Def.'s Mem.") at 3 (citing Exhibit ("Ex.") 2 (Conciliation Agreement entered into by the FEC and the SOA and Ashcroft 2000) ("Conciliation Agreement") ¶ IV.3; Ex. 3 (General Counsel Report #4) at 2. SOA was a "leadership PAC" or a political committee established by an elected official to support other candidates and party committees and to fund other political pursuits of the officeholder apart from his own re-elections. Id. (citing Ex. 4 (Smith Statement of Reasons)) at 3.

[3]Ashcroft 2000 was the authorized campaign committee that supported John Ashcroft's 2000 candidacy for re-election to the United States Senate from Missouri. Def.'s Mem. at 3-4 (citing Ex. 2 (Conciliation Agreement) ¶ IV.2; Ex. 3 (General Counsel Report #4) at 2-3.

§ 431(8) and 11 C.F.R. 100.7).  Additionally, the administrative complaint alleged that "neither Ashcroft 2000 nor the SOA []reported the contribution of the fund-raising list to the FEC, as required by [the FECA]."  Id. (citing 2 U.S.C. § 441a(a)(2)(a); 2 U.S.C. § 441a(f); and 2 U.S.C. § 434(b)).[4]

The FEC's investigation of the administrative complaint by the FEC's Office of the General Counsel ("OGC") revealed that SOA spent approximately $1.7 million to develop the fund-raising list.[5]  Id. ¶ 13.  According to the plaintiffs, a work product agreement was reached whereby the list was transferred to Ashcroft 2000 in exchange for permission to use his name and likeness in SOA's mailings.  Id.  The plaintiffs note that both organizations, SOA and Ashcroft 2000, "were controlled by the same individuals," and that "SOA already had the use of Mr. Ashcroft's name and likeness for at least six months prior to the work product agreement."  Id.  The OGC concluded that the exchange was neither bargained-for at arms's length, nor was it commercially reasonable, and the transfer of the mailing list therefore constituted an in-kind contribution to Ashcroft 2000 as defined by the FECA.  Id.  Documents describing the results of the OGC's investigation, including the OGC's reports and other FEC documents referenced in the complaint filed with the Court in this case are publicly

---

[4] The plaintiffs subsequently brought an action in United States District Court for the District of Columbia, alleging that the FEC violated the Federal Election Campaign Act by delaying for over two years the resolution of their claims against SOA and Ashcroft 2000.  Alliance for Democracy v. FEC, 335 F. Supp. 2d 39 (D.D.C. 2004)

[5] The FEC conducted an investigation into the allegations of Alliance's administrative complaint and "developed a significant investigative record"  Def.'s Mem. at 3.  Much of the information upon which the FEC based its findings has been placed into the public record.  Fifty-eight multi-page documents are available to the public, which constitute hundreds of pages and includes the General Counsel's Reports and supporting brief, briefs filed by the respondent, the Commissioners' Statements of Reasons, and the Conciliation Agreement entered into by the Commission and the respondents.  Id.

available through the Enforcement Query System on the Commission's website.  Id.

The OGC's investigation further revealed that by transferring the mailing list, SOA and its treasurer, Garrett Lott, violated the $5,000 limit on contributions from a political committee to a candidate in an election covered by 2 U.S.C. § 441a(a)(2)(A).  Id. ¶ 14.  Furthermore, the investigation disclosed that Ashcroft 2000 and its treasurer violated the prohibition on candidates accepting contributions prohibited by 2 U.S.C. § 441a(f).[6]  Id.  Moreover, the OGC found that both SOA and Ashcroft 2000 had violated the disclosure requirements contained in 2 U.S.C. § 434(b) by failing to report the value of the mailing list as an in-kind contribution.  Id.  The OGC specifically found that "excessive, unreported contributions were created by . . . the transfer of list rental income ("LRI") from [SOA] to Ashcroft 2000" totaling $66,662.  Id. ¶ 15.  Additionally, it determined that excessive unreported contributions in the amount of $46,300 was derived from "Ashcroft 2000's sale of accounts receivable from persons who had rented the list from SOA" and $80,000 from "Ashcroft 2000's own rental income [derived] from the list."  Id.  Finally, the OGC concluded that "Ashcroft 2000's use of the list in its own mailings" resulted in excessive unreported contributions totaling $61,955.  Id. According to the plaintiffs, "the OGC's findings concerning these contributions necessarily assume that the mailing list did not become the property of Ashcroft by virtue of the [Work

---

[6]This provision sates:
> Prohibited contributions and expenditures: No candidate or political committee shall knowingly accept any contribution or make any expenditure in violation of the provisions of this section. No officer or employee of a political committee shall knowingly accept a contribution made for the benefit or use of a candidate, or knowingly make any expenditure on behalf of a candidate, in violation of any limitation imposed on contributions and expenditures under this section.

Product Agreement], further establishing that the transfer of the list constituted an in-kind donation to Ashcroft 2000 that should have been reported under 2 U.S.C. § 434(b)." Id. The plaintiffs complain, however, that the Commission "failed to find probable cause to believe that the transfer of the mailing list constituted an in-kind donation, the value of which had to be reported by both SOA and Ashcroft 2000." Id. ¶ 16. Moreover, the plaintiffs challenge the Commission's failure to find probable cause as to Ashcroft 2000's use of the list and receipt of LRI from its own rental of the list. Id. Instead, "[t]he only activities as to which the Commission found probable cause were transfers of funds generated by . . . SOA's rental of the list [as itemized above] totaling $112,962. Id.

As a result of the OGC's investigation and findings, and the FEC's partial adoption of the OGC's findings,[7] on December 11, 2003, the Commission approved a Conciliation Agreement with SOA, Ashcroft 2000, and Garrett Lott, as Treasurer of both SOA and Ashcroft 2000, wherein they agreed to pay a $37,000 fine. Id. ¶ 17. According to the plaintiffs, "[t]he Conciliation Agreement acknowledges only that the transfer of LRI and accounts receivable earned by SOA to Ashcroft 2000 violated the law, and does not acknowledge violations comprised by the donation of the list to Ashcroft 2000, the failure to report the donation, or Ashcroft 2000's own use and rental of the list." Id. After approval of the Conciliation Agreement, "the Commission closed its file on MUR 5181." Id. ¶ 18. Because the Commission did not find the transfer of the fund-raising list to be an illegal contribution, it did not determine the actual monetary

---

[7]Pursuant to 2 U.S.C. § 437g(a)(4)(A)(I), the FEC may not enter into a conciliation agreement without an affirmative vote of four of its members.

value of the list, which the plaintiffs believe is far in excess of the $112,962 in excessive contributions found by the Commission.  Id.  Moreover, the plaintiffs complain that the Conciliation Agreement does not require SOA or Ashcroft 2000 to disclose and report the monetary value of the mailing list.  Id.  The plaintiffs claim that "[t]he lack of report and disclosure by the [SOA] and Ashcroft 2000, and the [FEC's] wrongful actions as detailed above have caused the plaintiffs actionable harm."  Id. ¶ 21.  Accordingly, the plaintiffs contend that the FEC's dismissal of their administrative complaint violated § 437(g)(a)(8)(A) of the Federal Election Campaigns Act.  Id. ¶¶ 35-36.

**II.     Standard of Review**

    **A.     Motion to Dismiss**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs motions to dismiss for lack of subject matter jurisdiction, "[t]he plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence."  Pitney Bowes, Inc. v. United States Postal Serv., 27 F. Supp. 2d 15, 19 (D.D.C. 1998).  In reviewing such a motion, this Court must accept as true all the factual allegations contained in the complaint.  Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).  Additionally, in deciding a Rule 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 n.3 (D.C. Cir. 1997); Herbert v. Nat'l Acad. of Sci., 974 F.2d 192, 197 (D.C. Cir. 1992); Haase v. Sessions, 835 F.2d

902, 906 (D.C. Cir. 1987); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).

### B.   Summary Judgment

In reviewing a motion for summary judgment, the Court must determine whether there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must review the facts in the light most favorable to the non-moving party in making this determination. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In making its determination, the Court evaluates the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . ," that are submitted to the Court. Fed. R. Civ. P. 56(c). Once a motion for summary judgment has been properly made and supported by evidence, the non-moving party must then demonstrate the existence of a genuine issue of material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248. Summary judgment is mandated if a party fails to establish an element essential to that party's case on which that party will have the burden of proof at trial. Celotex Corp., 477 U.S. at 322.

"For purposes of ruling on a motion to dismiss for want of standing, both the trial

and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501 (1975); Haase, 835 F.2d 902, 906 (D.C. Cir. 1987).  A motion to dismiss or for summary judgment for lack of subject matter jurisdiction should not prevail "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief."  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); Beverly Enters., Inc. v. Herman, 50 F. Supp. 2d 7, 11 (D.D. C. 1999).  At this juncture, the plaintiffs enjoy all favorable inferences that can be drawn from the alleged facts.  St. Francis Xavier Parochial Sch., 117 F.3d at 624.  However, the Court "has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," and the plaintiffs bear the burden of pleading a claim that is within the Court's subject matter jurisdiction.  Grand Lodge of Fraternal Order of Police, 185 F. Supp. at 13; Pitney Bowes, Inc., 27 F. Supp. 2d at 18.

**III.   Analysis**

The plaintiffs have brought this action pursuant to the FECA, specifically, 2 U.S.C. § 437g(a)(8)(A), and the Declaratory Judgment Act, 28 U.S.C. § 2201.  The defendant has filed a motion to dismiss, or in the alternative for summary judgment, which is grounded on the plaintiffs' alleged lack of standing to bring this action.  The FECA provides, in part, that

> [a]ny party aggrieved by an order of the Commission dismissing a complaint filed by such party under paragraph (1), or by a failure of the Commission to act on such complaint during the 120-day period beginning on the date the complaint is filed, may file a petition with the United States District Court for the District of Columbia.

2 U.S.C. § 437g(a)(8)(A). And the Declaratory Judgement Act provides that

> [A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).

Article III of the United States Constitution limits Congress' grant of judicial power to the adjudication of only "cases" and "controversies." FEC v. Akins, 524 U.S. 11, 20 (1998); Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992). This limitation requires the plaintiffs to have what has been classified as standing, which is an "essential and unchanging part of the case-or-controversy requirement of Article III." Id. at 560. Supreme Court precedent has established that standing contains three elements: injury-in-fact, causation, and redressibility. Id. at 560-61. Thus, a

> plaintiff must have suffered an "injury-in-fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Id. (internal citations and quotations omitted). The burden of establishing these elements of standing lies with the party invoking the Court's jurisdiction. Id. at 561; Wertheimer v. FEC, 268 F.3d 1070, 1074 (D.C. Cir. 2001). Moreover, since the standing requirements are an indispensable part of the plaintiff's case, "each element

must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561.

The first element of standing – an injury-in-fact – is defined as an invasion of a legally protected interest that is "concrete and particularized" as well as "actual or imminent," rather than just being "conjectural" or "hypothetical." Id. at 560; Common Cause v. FEC, 108 F.3d 413, 416 (D.C. Cir. 1997). "By particularized, we mean that the injury must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1.

The Supreme Court has held that "a plaintiff suffers an 'injury-in-fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." Akins, 524 U.S. at 21. Indeed, the "FECA establishes a right to truthful information regarding campaign contributions and expenditures, and that right adheres both before and after the election at issue." Alliance for Democracy v. FEC, 335 F. Supp. 2d 39, 47-48 (D.D.C. 2004) (citing Akins, 524 U.S. at 21). Moreover, the failure to obtain information that, by statute, the plaintiffs had a right to have results in an informational injury. Id. at 48. However, no informational injury will be found if the plaintiffs "fail[] to show either that they are directly being deprived of any information or that the legal ruling they seek might lead to additional factual information." Wertheimer, 268 F.3d at 1074.

The plaintiffs' allegations of injury rest upon the "alleged failure of SOA and Ashcroft 2000 to report the exact value of a mailing list that was allegedly contributed by

SOA to Ashcroft 2000 in 1999." Defendant Federal Election Commission's Memorandum of Points and Authorities in Support of its Motion to Dismiss, or in the Alternative, for Summary Judgment. ("Def.'s Mem.") at 8. The defendant contends that the "plaintiffs cannot demonstrate an 'informational injury' because they already have the information they allegedly seek." Id. at 11. Specifically, the defendant explains that "Alliance ignores the fact that [the] information [provided by the FEC] far exceeds what would normally be reported by political committees that transferred a mailing list." Id. On the other hand, the plaintiffs claim that they "still do not have the information they sought since day one: the value of the mailing list as an in-kind contribution." Pl.'s Opp'n at 9. And they posit that "[t]his information is, and always has been, the basis of their informational injury." Id.

This Court agrees with the FEC's position that the plaintiffs lack standing to maintain this action. In support of this conclusion, the Court relies on Alliance for Democracy v. FEC, 335 F. Supp. 2d 39 (D.D.C. 2004). In Alliance, the facts and parties are identical to those in the present case. While the facts and parties are identical, in Alliance, the "[p]laintiffs alleg[ed] that the FEC failed to act or delayed in acting with regard to the FEC's investigation of Ashcroft 2000, the Spirit of America PAC, and Garrett Lott, the treasurer of these political action committees." Id. at 41. Here, the plaintiffs are seeking a determination that the FEC's dismissal of their administrative complaint and its rulings with respect to the donation of the mailing list by SOA to Ashcroft 2000 and their failure to disclose this illegal contribution was "arbitrary and capricious, contrary to law and a clear abuse of the agency's discretion." Pl.'s Compl. at

2.

In <u>Alliance</u>, Judge Sullivan ruled that the plaintiff's case was rendered moot by the same conciliation agreement reached between the FEC, Ashcroft 2000, SOA and Garett Lott, as treasurer of both SOA and Ashcroft 2000.  <u>Alliance</u>, 335 F. Supp. 2d at 43.  In addition to this ruling, the Court also held that the plaintiffs lacked standing under Article III.  <u>Id.</u> at 48.  The Court stated:

> [I]t seems apparent to the Court that Alliance has failed to allege an Article III injury because [the] plaintiffs already possess the information they claim to lack.  Further, plaintiffs have failed to show how information about the precise value of a mailing list and the date it was transferred could have a concrete effect on [the] plaintiffs' voting in future elections involving different candidates.

<u>Id.</u> at 48.  The information the <u>Alliance</u> Court determined the plaintiffs already possess is the same information at issue in the present case.  The Court in <u>Alliance</u> reasoned that "had the agency found no violation and dismissed the complaint, then it seems that plaintiffs may be entitled to the information they seek so that they could determine whether or not to pursue the action further."  <u>Id.</u> (citing <u>Akins</u>, 524 U.S. at 20-22.)  However, the Court concluded that "since the process has progressed as specified in the statute, it seems that [the] plaintiffs have received everything they are entitled to under the FECA. . . ."  <u>Id.</u>  This Court adopts the ruling in <u>Alliance</u> – specifically that the plaintiffs lack standing – for the same reasons expressed in <u>Alliance</u>.

Here, "[t]he voluminous documents available on the [FEC's] website provide abundant raw data and numerous views of how that data could be analyzed to determine the value of the mailing list."  Def.'s Mem. at 12.  Specifically, "[t]hese

documents disclose when the SOA began developing the list, how it developed the list and at what cost." Id. Additionally, the information "discloses how the two committees used the list, and how much income it generated." Id. (citing Ex. 5 (General Counsel's Brief in the Matter of Spirit of America PAC and Garrett Lott, as Treasurer, Ashcroft 2000 and Garrett Lott as Treasurer)) at 3-4 (approximating costs to send prospecting solicitations to its vendors); Ex. 2 (Conciliation Agreement) at IV.19 (detailing SOA's list rental income). The plaintiffs also have the benefit of the commissioner's differing views on the value of the mailing list. Def.'s Mem. at 14-18. The information available to the plaintiffs far exceeds what would normally be reported by political committees that transfer mailing lists. See 2 U.S.C. § 434(a)(1) & (12) (requiring only that "a political committee [] file reports of receipts and disbursements" and that "the FEC disclose those reports.") Therefore, this Court concludes that the plaintiffs lack standing because they already have the information they are seeking and therefore have not suffered an informational injury.

As additional support for this Court's conclusion, and contrary to the plaintiffs' implication, the FECA does not require the FEC to determine the "monetary value of the mailing list." See generally 2 U.S.C. § 434 (requiring only that the FEC disclose information that regulated entities are required to report to it); 2 U.S.C. § 437g(a) (reciting the administrative and judicial practice and procedure regarding disclosure of federal campaign funds). Indeed, nothing in the FECA requires the Commission to determine the exact value of the mailing list. As such, requiring the FEC to quantify the value of the list would place an obligation on the FEC beyond what is required by the

FECA.  Moreover, a review of the various commissioners' statements of reasons which express their positions concerning the plaintiffs' allegations and the subsequent investigation by the OGC, reveal that the commissioners were unable to reach a consensus on how the list should be valuated.  For example, the OGC recommended that the FEC find probable cause to believe that Ashcroft 2000 received excessive in-kind contributions totaling $254,917 from the mailing list and its use.  Id. at 14 (citing Ex. 10 (Statement of Reasons by Commissioners Weintraub, Thomas & McDonald)) at 1 (stating that "[i]n MUR 5181, the Commission split 3-3 on the [OGC's] recommendations that the Commission find probable cause to believe John Ashcroft's leadership PAC, Spirit of America, made excessive in-kind contributions of almost $255,000 to John Ashcroft's authorized committee, Ashcroft 2000, in violation of the [FECA].")[8]  On the other hand, three other FEC commissioners disagreed – two found Mr. Ashcroft's agreement with SOA and Ashcroft 2000 were fair market value exchanges.  Id. (citing Ex. 9 (Statement of Reasons by Commissioners Mason and Toner)) at 9-11.  The third

---

[8]Specifically, the OGC concluded that SOA made an excessive contribution of $192,962 in the form of list rental income earned by SOA that was provided to Ashcroft 2000 in the following ways: (1) payments redirected in December 1999 in the amount of $66,662.22; (2) accounts receivables - the right to collect payment from persons who had rented SOA's list sold by Ashcroft 2000 to outside venders in the amount of $46,299.83; and (3) the approximate share of the $121,254.98 income paid through an outside vendor to Ashcroft 2000 that was attributed to the SOA mailing list that amounted to $80,000, for the total of $192,962.05. Def.'s Mem., Ex. 10 (Statement of Reasons by Commissioners Weintraub, Thomas & McDonald) at 3-4.  The OGC also found an excessive contribution of $61,955 that resulted from Ashcroft 2000's use of SOA names in Ashcroft 2000 mailings. Id. at 4.  However, upon the FEC's consideration of the OGC's probable cause recommendations, Commissioners Mason, Smith and Toner supported only the first two excessive contribution recommendations made by the OGC. Id.  On the other hand, Commissioners McDonald, Thomas and Weintraub also supported the two other excessive contribution findings recommended by the OGC. Id.  Thus, because there were not four votes to support all of the probable cause recommendations made by the OGC, which was necessary to pursue the two additional excessive contributions recommendations, the Commission found probable cause only with respect to the first two categories of excessive contributions ($112,962) and the attendant reporting violations found in 2 U.S.C. § 434(b). Id.  Consequently, as previously discussed, a Conciliation Agreement was reached whereby the respondents, "inter alia, agreed to pay a civil penalty of $37,000. Id.

commissioner concurred that it would "be inappropriate to second-guess the list agreements." Id. (citing Ex. 4 (Statement of Reason of Vice Chairman Smith)) at 8-9. Thus, even if the OGC's recommendations had been fully adopted, there is no reason to believe that it would have resulted in a finding of the exact value of the list. As can be gleaned from the commissioners' statements of reasons, there was no single, objective value that could be attached to the mailing list.

The plaintiffs rely heavily on Akins as support their claim of informational injury. Pl.'s Opp'n at 10. In Akins, the plaintiffs challenged the FEC's decision that the American Israel Public Affairs Committee ("AIPAC") was not a "political committee" and therefore was not required to disclose its contributions and expenditures. 524 U.S. at 15-16. The FEC's General Counsel found that the AIPAC had made expenditures that were campaign related and amounted to advocating for the election or defeat of particular political candidates. Id. at 17. The FEC, however, concluded that the AIPAC was not subject to the FECA's disclosure requirements. Id. at 18. When the plaintiffs, who were a group of voters that often had views opposed to those of the AIPAC, challenged the FEC's dismissal of their complaint in federal court, the FEC argued that the plaintiffs did not have standing to bring the action. Id. at 19. The Supreme Court disagreed, finding that the plaintiffs had established that they had both prudential and constitutional standing to challenge the actions of the FEC. Id. at 26. The Court reasoned that the voters had suffered an "injury-in-fact," namely, "their inability to obtain information - - lists of AIPAC donors . . . , and campaign-related contributions and expenditures - - that . . . the statute require[d] that AIPAC make public." Id. at 21; see

also <u>Public Citizen v. Dep't of Justice</u>, 491 U.S. 440, 449 (1989) (finding an injury-in-fact when the plaintiff was denied information that should have been disclosed by statute). The Supreme Court noted that the FECA was designed to "protect individuals such as [the] respondents from the kind of harm they say they have suffered, <u>i.e.</u>, failing to receive particular information about campaign-related activities." <u>Akins</u>, 524 U.S. at 22.

  Although the present case is similar in some respects to <u>Akins</u>, it is also equally distinguishable. The most notable difference is that the plaintiffs in <u>Akins</u> had been completely denied access to any information about the AIPAC's receipt and disbursement funds, and thus had no way to determine whether a particular candidate was even supported by the AIPAC. <u>Id.</u> at 20. In contrast to the plaintiffs in <u>Akins</u>, the plaintiffs here are not seeking a determination as to whether Ashcroft 2000 and the SOA were political committees, and therefore subject to the registration and reporting requirements of the FECA. Rather, the plaintiffs are seeking a specific monetary value of an item that has already been reported. And unlike the plaintiffs in <u>Akins</u>, the plaintiffs here began this action while already in possession of information regarding the transfer of the mailing list from the SOA to Ashcroft 2000. <u>See</u> Compl. ¶ 1 (stating that the FEC's investigation revealed that the SOA developed a fund-raising list costing over $1.7 million and confirmed that the SOA illegally donated the list to Ashcroft 2000). Thus, while a "plaintiff suffers an 'injury-in-fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute," <u>Akins</u>, 524 U.S. at 21, no informational injury has been sustained here because the information required to be disclosed by the statute has already been disclosed.

The present case is more analogous to Judicial Watch, Inc. v. FEC, 293 F. Supp. 2d 41 (D.D.C. 2003). In Judicial Watch, a nonprofit legal organization, and a Hollywood executive and alleged contributor ("contributor") to Senator Hillary Rodham Clinton's New York Senatorial campaign committee, brought an action against the FEC for its purported failure to timely investigate their administrative complaint regarding the campaign's alleged reporting discrepancies in violation of the FECA. Id. at 43. The contributor had produced a "Hollywood Tribute to the President," a fundraiser for the Democratic National Convention and a tribute to then President Bill Clinton. Id. The contributor claimed that "he fronted $1.9 million of the cost of the 'Hollywood Tribute,' fundraiser, and that this amount represented contributions both in cash and in-kind to Senator . . . Clinton's New York Senatorial campaign committee." Id. Judicial Watch and the contributor had filed their administrative complaint with the FEC and alleged that "Senator Clinton's campaign committee failed to report approximately two million dollars in cash and in-kind contributions . . . made [to it] in connection with [the tribute and fundraiser], in violation of federal election law." Id. at 44. The plaintiffs claimed that the FEC's failure to timely respond to or investigate their administrative complaint resulted in an "'informational' injury to both the [contributor and the organization], as they [were] both deprived of information they sought when the administrative complaint was filed." Id. at 43.

The Court granted the FEC's motion for summary judgment finding, in part, that the contributor lacked standing to seek judicial relief because he did not suffer any concrete and particularized injury. Id. at 45. The Court reasoned that the individual

contributor was already "aware of the facts underlying his own alleged contributions to [the Senator's] campaign" and that "it appear[ed] unlikely that [his] administrative complaint [would] yield additional facts about [the Senator's] alleged reporting violations that [the contributor] was not already aware of when he filed the administrative complaint . . ." Id. at 47 (footnotes omitted).  Instead, the Court concluded that the individual contributor was "really seeking a legal determination by the [FEC] that the money he" contributed to the campaign should have been disclosed, and since it was not, a violation of the FECA occurred.  Id. (citing Common Cause, 108 F.3d at 418 (noting that what plaintiff desired was for the Commission to 'get the bad guys,' rather than disclose information[,]" which is an inadequate basis to confer standing)).  In short, the Court found that the contributor was "seek[ing] a finding by the Commission as to whether Senator Clinton violated the FECA."  Id.  And the Court concluded that because the contributor "[did] not have a justiciable interest in the enforcement of the law, . . . [his] alleged 'informational injury' [was] not cognizable injury under the FECA, sufficient to satisfy the standing requirement."  Id. (footnote omitted).

    The circumstances of Judicial Watch are similar to those of the present case.  First, and most important, as was the individual plaintiff in Judicial Watch, the plaintiffs here are already in possession of the information they are seeking to acquire.  As the record makes clear, the plaintiffs' administrative complaint was investigated, a conciliation agreement acknowledging violations of the FECA was entered into by the targets of the complaint, and all pertinent information relating to this issue is readily available to the plaintiffs.  Moreover, the defendant contends that "[i]n view of the information [the p]laintiffs have about the

mailing list transaction, it is apparent that what they really want is a legal determination that SOA and Ashcroft 2000 violated the law. . . ." Def.'s Mem. at 19. And the defendant asserts that the plaintiffs express this desire several times throughout their opposition brief. Id. For example, the plaintiffs admit that "[k]nowing the full extent of illegal activity by a key member of the President's administration is certainly pertinent to evaluating his candidacy." Pl.'s Opp'n at 18. Similarly the plaintiffs state that "Alliance wants to inform the public of the full amount of the illegal donations received by Ashcroft's 2000 Senate campaign." Id. The Court agrees that because the plaintiffs have all of the information they are entitled to pursuant to the FECA, these statements by the plaintiffs suggest that they are seeking an additional determination that Ashcroft 2000 violated the FECA. However, the "government's alleged failure to 'disclose' that certain conduct is illegal by itself does not give rise to a constitutionally cognizable injury." Wertheimer, 268 F.3d at 1074 (citing Common Cause, 108 F.3d at 417). Accordingly, just as the plaintiffs in Judicial Watch, the plaintiffs here do not have a "justiciable interest in the enforcement of the law." Judicial Watch, 293 F. Supp. 2d at 47. "Nothing in the FECA requires that information concerning a violation of the Act as such be disclosed to the public." Common Cause, 108 F.3d at 418. And "[t]o hold that a plaintiff can establish injury-in-fact merely by alleging that he has been deprived of the knowledge as to whether a violation of the law has occurred would be tantamount to recognizing a justiciable interest in the enforcement of the law." Id. This, the Common Cause Court held is something a court could not do. Id. Accordingly, because the plaintiffs already have access to "everything they are entitled to under the FECA," Alliance, 335 F. Supp. 2d at 48, their "alleged 'informational injury' is not cognizable injury under the FECA,

19

sufficient to satisfy the standing requirement." Judicial Watch, 293 F. Supp. 2d at 47.

## IV.    Conclusion

For the foregoing reasons, this Court finds that the plaintiffs have not established that they sustained an informational injury, and therefore have not satisfied the injury-in-fact requirement of standing.[9]  Accordingly, this Court grants the defendant's motion to dismiss for lack of jurisdiction.[10]

**SO ORDERED** on this 4th day of March, 2005.

REGGIE B. WALTON<br>
United States District Judge

---

[9] The plaintiffs have also filed a Motion to Compel Production of Documents Including Authority in Support Thereof [D.E. # 12].  Because the plaintiffs lack standing to pursue this matter, the motion is denied.

[10] An Order consistent with this Memorandum Opinion was issued on February 28, 2005.